The United States Environmental Protection Agency. David Williamson is here for the appellate and Kimmery Kimball is here for the athletes. And Mr. Williamson, you may begin. Thank you, Your Honor. Good morning. David Williamson for Petitioner RMS of Georgia, which is known in the marketplace as Choice Refrigerants. This is not the biggest case this Court will hear, perhaps not even this morning. It won't have sweeping implications, but it's critically important, perhaps even life and death for Choice Refrigerants, which because of EPA's decisions, is having one-third of its historic market share taken away and given to other companies. Well, I'm not even sure that we should even reach the merits of the issues presented in this appeal. This cap-and-trade program that was developed by the Environmental Protection Agency is a nationally applicable program. Why is venue appropriate in the Eleventh Circuit rather than the District of Columbia Court of Appeals if this is a nationally applicable cap-and-trade program to phase out the production and consumption of hydrofluorocarbons because of the threat they pose to the climate and the environment? Yes, Your Honor. Certainly, the issue of venue and jurisdiction has been thoroughly briefed, but what EPA never explains is why judges sitting in Washington, D.C. are better equipped to decide who owns certain chemicals that were imported to Alpharetta, Georgia. The Clean Air Act bests this Court with jurisdiction to decide local matters. This is like an individual facility permit in the Clean Air Act pollution context. The Clean Air Act pollution program is always national, but every facility receives an individual permit, and that's considered to be a local action. Yeah, but here the difference, though, right, is that there's a cap, right? So there's a nationwide cap. So to give you more, whatever this is, you have to take some from someone else, right? Well, there is a formula. Essentially, there's one pizza pie, and everybody gets slices of that pizza pie, but following the approach, and we don't have a problem following the approach of Southern Illinois, and by the way, there's not binding precedent for this circuit, so you can guide it by logic and what's convincing for you, but that case and other cases that follow Southern Illinois say, look at the nature of the agency action. Well, the action here is EPA's determination of who owned particular imports of chemicals. We're not challenging the formula that went into then dividing that pizza pie up after that decision was made. What is an oddity here, Your Honor, is that EPA published the end result of its formulation, its formula calculations in the Federal Register, but it never published its decision on these issues of who owned these chemicals. Normally, you would expect an agency to issue a decision letter or a determination letter. There was no decision. So a company in, let's say a company in California that's got the same claim could bring the claim in the Ninth Circuit, and then a company in the Seventh Circuit in Chicago could bring the same claim in the Seventh Circuit, and see where I'm going. This is why you've got the District of Columbia Court of Appeals with the appropriate venue to resolve these sorts of things, especially in a case like this where your client's allocation is just one line item in a nationally applicable program. Respectively, Your Honor, I see where you're going, but our challenge is to EPA's factual determination as to the qualification or the ownership of these chemicals. We're not challenging the formula. We're not challenging the line item in a bigger program, and Your Honor, Congress could easily have given all these decisions to the District of Columbia. The statute specifically divides between nationally applicable and locally applicable. But I'd like to, if I could, come back to the question Judge Brasher asked you. I looked at the Federal Register Table 3 for consumption allowances for the year 22, and there are 40 companies involved in consuming the hydrofluorocarbons, one of which is RMS of Georgia, and they allocated 1,615,592 MTEVs to you, and they allocated a sum to the other 39 consuming companies based on a national formula that they created, and you're not challenging, at least as a general matter, and you say you're entitled, if I read this right, to 27 percent more of these MTEVs, these metric tons of exchange value equivalent. If that's right, since this is essentially a zero-sum game, that 27 percent would have to come from one of these other companies, would it not, or two of these other we make concerning the allocation necessarily affects the whole pie? Their argument is that necessarily makes it national in nature. Why are they not correct about that? Well, you're exactly right, Judge Marcus. That's their argument, but they're basing their argument on Southern Illinois and that line of thought that says, look at the nature of the agency action. Those cases also, Your Honor, say, do not look at the effect, because one can't determine the effect by looking at the outset at what action is being challenged, and the decision on venue of necessity needs to be made at the outset, not waiting for the briefs. Under EPA's own adopted line of case law, the effect, and this is picked up by Judge Posner, for example, in New York v. EPA, the effect in a national program is always going to ripple out, but one looks at the location of the regulated entity, that's New York v. EPA, one looks at the facts that are being determined are particular to that facility, and that's Madison Gas. But I just want to sort of come back to my question, if I can, for a moment. If you're right, and the EPA misallocated and gave you a shortfall of 914,578 MTEVs, which is your claim, if I've got it right, that's got to come from someone else, or a group of other companies. Does that not affect the whole pie, since it is essentially a zero-sum game? Yes, Your Honor. I think that's the point. It does affect the pie, but the precedential case law says... Forget the case law for a minute. We're writing on a blank slate here. It does. It does. I'm just trying to get you to tell me whether, if you're right, that any challenge to the allocation necessarily affects the other 39 companies. In your case, you say there are two, Company A and Company B, they got too much, you got too little, give us theirs. They're not based here in this region, right? No, no, you're absolutely right, Your Honor. Do I have that right, both of those companies, A and B, are outside this region? Yes, that is true as well, right? They're outside this circuit. So you're right, Your Honor, that there are 40 companies. They all divide up that pie, but before you get to that point, and we're not challenging the calculation, we're not challenging the formula, before that happens, EPA makes factual determinations with regard to each of those 40 companies. They look at the market share, and that's based on what chemicals are brought in, who's on the paperwork, who's the actual owner, these regulatory criteria, and EPA makes that decision as if it's making a decision for a particular facility, for a cement plant or a power plant. That is done locally in each individual circuit. Once that factual determination is made, that's an agency action that makes that determination, and the fact that EPA never actually put that in writing, there's no document. Let me ask you about that. It's sort of, it's interesting, they put it out in the federal register, they have a table three, here's the consumption allowance for each of 40 companies. Would the result be different if they had put out a separate order for each of the 40, rather than putting it out in a single registry? No, your honor, we're not suggesting there should be 40 federal registers with the end total for each facility. What we're saying is, when a factual determination is made in an agency proceeding that results in an agency decision, that decision is embodied or should be embodied normally in a written document that then is the agency decision. So EPA, by just reporting the end results of 40 companies, essentially can gerrymand venue and jurisdiction to make it national when the decisions are actually individual to each facility. Can I ask you just one final question? It was something that Judge Wilson raised with you. By your lights then, just so I understand how the venue provision works for cap and trade when we're talking about allocation of a scarce and limited and shrinking pie. Anyone of these 40 companies, if they had challenged their allocation saying, you got it wrong as to us, here's why, that would be local in nature? Each of the 40 would make it local? Your honor, if the decision was based on factors or facts that are particular to that facility, our position is that Congress intended that that decision be heard in the even if the math, after those factors. You mean if they challenged the proposition that you're going to use the high three years, an average of the high three, that would be an attack on the formula? That's a national rule, absolutely. Okay. Right. But to get there, EPA has to make fact-bound determinations regarding, and you'll see in the record we submitted four letters that went through all the facts, explained the agency-principal relationship. That decision was made, but it was never reported by the agency. There should have been a separate decision document that then would be more obviously the agency action and what we would be challenging. We're not challenging anything in the final Federal Register report of the 40 rules. Once EPA made those factual determinations, they did the math correctly. We're saying that the inputs were wrong, and I see them far over time. We've been talking about venue predominantly, and so in the event that venue here is appropriate, I'll give you another minute to just talk about the merits. Thank you. I want to emphasize that with regard to Company A, EPA has regulations that, now they're perhaps poorly drafted, but they explicitly say that the actual owner and the consignee, which is where the chemicals end up, which is Alpharetta, Georgia, are to be considered to be the importer of these chemicals. What EPA has done in its brief is it's which is defined by the statute as bringing into the United States, landing, bringing, and introducing. Well, that just is a circular approach that brings us right back to the question of who brought these chemicals in. Well, in the four letters that Choice sent, Choice explained that it manufactures a patented product. It brings the chemicals in to manufacture that product, and it used Company A as a shipping agent to facilitate, but none of those companies, but Client, your client doesn't pay the duties or advance the money to the supplier? Name doesn't appear on the customs records? Well, Your Honor, our answer would be under the agency principle, the agency principle principle, that we do do that through our agent. It's like buying a house through a real estate agent. The real estate agent might put the money in escrow or transfer the escrow, but that doesn't mean that the agent owns the house. It's also important, if you think about the bringing in focus that EPA is now proposing, that if you actually literally applied bringing in the statutory language, it would be the shipping, the ship owner that actually brings the goods into the United States, because the agent, neither the agent nor my client ever physically touched the chemicals until they end up at our Alpharetta manufacturing facility. So EPA, we're arguing, should not have ignored the fundamental agency principle relationship, especially when it was uncontroverted. Company A is making no claim on this. This is a windfall that Company A received, and it's a windfall going back 8, 9, 10 years before the AIM Act was even proposed as legislation. If we had known that EPA was going to take this position, then only who wrote their name on the paperwork 10 years ago, we of course would have said we're the principal. We would have instructed our name on the paperwork, but it's very common in this industry to have the shipping agent file that paperwork, even file the greenhouse gas report, because there was no consequence. Company A does need these allocation allowances in order to bring these HFCs here from abroad, and your client doesn't, right? Well, your honor, I would say exactly the opposite, respectfully. The AIM Act is designed, the trading program is designed to hand out the allowances based on historic market share. Now everybody takes a haircut, and that's the idea of the cap going down, but in terms of market share, Choice Refrigerants has been manufacturing its proprietary patented product for 10 years. In past years, it used the shipping agent to help it bring in these chemical ingredients, which went to Alpharetta. Because now a windfall is going to Company A, it's not the entire one-third. Some of it is the patent violation company as well, but Choice cannot make as much of its product now as it could because its shipping agent now has the ability to bring in those chemicals, and we would have to then buy the chemicals from the former agent or current agent. Exactly right, your honor. Exactly right. Thank you, Mr. Williamson. You've reserved some time for rebuttal. We'll hear from the EPA. Ms. Petitioner challenges EPA's determination of how all companies that import and produce hydrofluorocarbons nationwide should share the continually shrinking national pool of HFCs under the American Innovation and Manufacturing Act. At the outset, this court should dismiss the petition in favor of petitioner's currently stayed D.C. circuit petition because venue for this matter is only appropriate in that circuit. The final action at issue here, the nationwide allocation action, is necessarily a nationally applicable final action. By challenging his share of the national allocation, petitioner necessarily challenges all allocations because they're all interrelated. As such, EPA's determination can only be considered a nationally applicable final action, and this petition can only be brought in the D.C. circuit. But if this court reaches the merits, it should uphold EPA's decision. EPA reasonably calculated how entities would share the nationwide pool based on their documented historical imports because all evidence that was before EPA at the time that it made this decision demonstrated that to the United States. EPA reasonably credited those companies with all of the historical imports that petitioner is now claiming when calculating everyone's share of the nationwide pool. Under the framework rule, the actual owner is the importer, right? And company A, who's the importer if that's the case under the framework rule? Under the framework rule in the allocation section, under 8411, it says that the allocations will be given to the entity that imports. And the entity that imports is the entity that lands the HFCs in the United States or the entity that brings the HFCs into the United States. And based on the evidence before EPA at the time that they made this decision, company A was the company that into the United States. As your honor noted, company A is the company that actually purchased the HFCs abroad. Company A is the company that arranged for all shipment. Company A is the company that paid the customs duties. And company A is the company that reported the imports to various federal agencies. So under the allocation rule, company A is the only company that could have received the allocations based on the evidence before the EPA. Petitioner claims now that some of company A's imports should have been attributed to Petitioner, but it didn't submit any evidence demonstrating that it had any right to those imports. Can I ask you a question about venue? What do you think? So as I see it, we don't have any case law on this in our circuit telling us how to assess this national versus local question. What do you think the standard should be and why? We believe the standard should be that the face of the agency action should control. So because venue needs to be decided at the threshold, the court should look at the agency action itself. And here, that action is the allocation of this Judge Marcus asked opposing counsel, you know, if instead of one document that lays out the allocations, if you had provided, you know, you get this permit, if it had been more of a permitting kind of thing, you get this permit, you get this permit, you get this permit, would that mean something different for the purpose of venue? So in this circumstance, no, because the actual agency action is the allocation. So even if they provided notice in a different manner, the action itself is the allocation. And here, where the allocation is necessarily interdependent among all of the entities that received the allowances, it's necessarily a nationwide, a nationally applicable action. And so then if that's the case, then it seems like what you're saying is the cap on the allocation. Is that what makes it national, the fact that you can't go over? So if it were just sort of, you know, the rule is you get this many hydrofluorocarbons and there's no cap nationwide, would the challenge then be a local challenge? So it's not just the cap. Okay. The specific formula that was used, because the contrary to what petitioner has asserted, their allocations are not solely dependent on their own, on the company's own data. All of them are interrelated, because the way that allocations were done was to take the top three years for each company, their top three years of both imports and production, and then to get an average of that, and then to divide that average by the sum of the average high yield. Right, right. But they're not challenging that though, right? I mean, they're not saying that that formula is problematic, right? Right. But that formula necessarily makes all of the allocations interrelated, because- Gosh, that seems really broad then. So whenever the EPA has a regulation that says this is the basis upon which we're going to provide permits, and then gives individual permits out to people, any challenge to the individual permit has to go to DC? No. So the way that the allocation was done here specifically made the allowances interrelated. And it did so because of the cap, but the specific formula actually makes every allocation dependent on every other allocation, because the denominator for figuring out their market share is the sum of all of their average high year. Right. But I mean, that's just another way of saying that the cap exists, right? No, because the cap exists, and that's absolutely part of what makes this nationally applicable, because if we did anything for petitioner, it would necessarily change everyone's percentages. But the formula itself also does that, because the formula itself, I mean, because they use the high three years. So for example, if company A has a million imports in year one, 2 million in year two, 3 million in year three, and 999,999 in year four. And petitioner says, well, now 500,000 of that year one imports are mine. That doesn't mean that the allocation that company A got is now decreased by the same amount that because the high three years just changed which year it is for company A. You see what I'm saying? I think so. Yeah, that just, I mean, I'm having a difficult time understanding how that's just not another way of saying that the formula we used imposed a cap on what people use a nationwide formula to look at this, that imposed the denominator. You know, you can't change that Are you saying that their action of success would change the denominator? Is that what you're saying? I'm saying that the action itself challenges the denominator. Okay. Also, just for clarity, the statute imposes the cap, not the agency. Help me with this though. If I understand your argument, it's very simple. It's a zero-sum game using sort of the games theory. What you have here is a fixed amount, cap and trade says we're going to reduce each year the amount. And in this year, there are 40 consumers and we're going to give each a pro rata share based on the top, an average of the high three years. Your argument then is, if I hear it right, that every petitioner who challenges the allocation necessarily yields a challenge to the national applicable regulation and it must be in the DC circuit, right? That's correct. Okay. So there would be no circumstance where a local company that challenges the allocation would be in the circuit within which that firm is housed. That's correct. Because it necessarily affects everyone else in the case, whether you put it in a single document or in 40 orders, doesn't matter. That's correct. Action itself. Okay. I understand the argument, but help me understand what Congress was doing here with its venue provision. Congress says for this act, look to the Clean Air Act. If you look to the Clean Air Act, it has three different provisions. One says the DC circuit is the correct venue for cases against nationally applicable regulations. You say that's this because if you take more from A to give to B, it has a national effect. The second is the appropriate circuit is the correct venue for cases involving an action that is locally or regionally applicable. And third, the DC circuit would be the correct venue for locally or regionally applicable rules that are quote, based on a determination of nationwide scope or effect. And if in taking such action, the administrator finds and publishes that such action is based on such determination. We know it's not the third, right? Correct. Okay. So it's either A or B. Congress contemplated that some of this stuff would be local or they would not have adopted wholesale the venue provisions found in the Clean Air Act, right? We can agree on that. They agree that Congress decided that part of the statute in its entirety could be challenged locally and part of it could be challenged in DC. Help me understand then what in your judgment could be challenged locally when it comes to an allocation of this scarce resource. So the statute provides for a lot of provisions other than just the initial assessment of the a company's allocations can be revoked if the company doesn't pay their anti-dumping duties, for example. So the administrative consequences section of the action, which is at 84.35, I believe. Yes, 84.35. The administrative consequences could easily have consequences that were local in nature. The allocation provision at 84.11 is necessarily national in scope. So where are Company A and Company B located in the 11th Circuit? I believe that Company B is, but Company A is in the 4th Circuit. But getting back to sort of to my question, understanding what would be local as opposed to what would be national in nature. So the amount of allocation, if that's challenged, that's necessarily national always for all 40 companies. That's correct. Because for every action here, there's an effect there. That's correct. On the other hand, and if an allocation is revoked because of some violation of the anti-dumping provision, that would be local. That's correct. Is there any other example you could give me under this statute where something would be local rather than national? Well, I think any of the administrative consequences could potentially be local. Anti-dumping isn't the only reason that an entity's allocations could be revoked. But because those allocations are being revoked and they're just being rescinded as opposed to having to recalculate everyone else's allocation, that would be a purely local or regional action. Let me ask you this question. When I was looking at this Table 3 that was part of the Federal Register issued by the EPA October 7, 21, for the allowances for calendar year 22, I see RMS of Georgia and the amount $1,615,000, blah, blah, blah. The other companies, A and B, can I pose A and B into the actual names? I didn't see it. Is that part of the record, I guess, is what I'm really asking. So I can point you to where you can find it in the record. So it is in the record. It's not specifically identified out that Company A is whatever. Those words don't appear anywhere. But I can show you where they are. So at Addendum 95, you find the identity of Company A. And Company B takes a little bit more work. Let's just stop for a second. What's the name of Company A? Where would I find it on this Table 3? Petitioners claim that as confidential business information. But Company A is on the table. And if you look at Addendum 95 and compare the companies there with the list of companies in the table, you would find it. For Company B, the location is Addendum 69, footnote 3. In that footnote, it lists a group of companies that work together as a single company. So the answer is you can find in the record A and B, and they match up to the entities listed in this Table 3? That's correct. If the Court has no additional questions, we'll rest on our papers. All right. Thank you, Ms. Kimball. Mr. Williamson, you've reserved some time for rebuttal. Thank you, Your Honor. The Court was generous with its time overrun before, so I'll try to keep this short. Just as a footnote, the counsel for the government said that the petitioners had asked to keep the Company A and Company B names as confidential business information. That was the government's position, just as a footnote. But we didn't disclose those names because we thought it was consistent. Quick question about that, then. But you agree that Companies A and B, whatever their names are, are embodied in this Table 3? Yes, absolutely. Now, in terms of jurisdiction, I don't understand how the government is drawing the line. And if one looks at the precedent of Southern Illinois and other cases that they cite to, which say, do not look at the effects. The one case that's directly on all fours is Madison Gas, and that was a cap-and-trade program. It was sulfur for power plants, but exactly the same thing. And the Court there said, well, we understand there's an effect in dividing up this pizza pie, but the calculations that EPA announced were based on the generating capacity of a particular power plant, the way that power plant operated, and the emissions that came from that smokestack. And that's why the Seventh Circuit in that case said that even this is part of a national program, that's an individual local. So in Madison Gas, though, and correct me if I'm wrong, but this is the way I understood Madison Gas, is the Seventh Circuit said, look, with respect to this program, if the petitioner wins, you're going to have to increase the nationwide, you know, you're going to have to pierce sort of the nationwide cap, whatever, increase the overall amount. But here, though, you're trying to take allocations from other companies. Is that not a way to distinguish Madison Gas? I don't know that Madison Gas reached that conclusion. I think that the Court observed that there might be an effect on the cap, but said that that doesn't, that's not part of the analysis because one looks at the agency action. Right, no, I'm conceding, I'm conceding. They said, look, the moat, they completely, they said it was not nationwide, but they said, look, even if we're talking about a nationwide effect, at the most, it would be to increase the cap. Whereas here, we're not talking about, I mean, you're trying to get allocations that are, that go to other people, other companies. There will be a reshuffling of the allocations, certainly. That's the effect that happens after the agency action. But Southern Illinois said, don't look at that effect because that's downstream. But the example that the government gave of revoking allowances is where I'm puzzled by how they're drawing the line. There actually have been instances in which, where companies have been granted allowances on the table, Judge Marcus, that you were focused on, and then EPA has determined that there was a mistake, and they have revoked, these are not my clients, but they have revoked those allowances. Now, that is also going to have a ripple effect, and what EPA ought to do, because now there's an extra slice of pizza, maybe a small one, but it ought to reallocate some of the pepperoni and toppings to the other companies. So I don't think that EPA does that, but they ought to be doing it, but it's not a principle for a dividing line. And I want to emphasize also what the final action is. Repeating myself, but we're not challenging the nationwide announcement of the final tallies. We're challenging the determination that Company A owned those imports, not us. We're challenging the determination that EPA made on a policy basis that it can give allowances to a bad actor who has infringed a patent and basically smuggled imports in under our patent and can make a policy decision based on that to give the allowances to Company B. Now, where is that? Council referred to EPA's thought process, but where is that embodied? Whatever that document is, or internal memorandum that exists somewhere within EPA, that's what we're... In order to make that determination, we just look to the face of the agency action, right? Except, Your Honor, EPA never published its agency action. That's what we're struggling against. EPA says that it looked at who paid for the imports. EPA says it looked at who filled out the paperwork, but that Federal Register has no discussion of that. There is a decision somewhere that perhaps EPA committed to paper, or perhaps they didn't. That's the decision we're challenging. Can I ask you a question just about practicality? I definitely don't want you to give any strategy away or anything like that, but you filed a protective petition in the D.C. Circuit. Is there a reason why that you can disclose why you are preferring to be in the 11th versus the D.C. Circuit? Is there like a reason I'm just not aware of? There's not a preference, Your Honor, but it's simply that's our reading of the Clean Air Act. We had to follow the statutory provisions, but of course, this Court is going to tell me whether I have to argue back in front of the D.C. Circuit, but certainly... The right answer, this is a well-qualified circuit with good judges. Right, bias in favor of the 11th Circuit is fine. I'm glad I didn't have to say that, Your Honor. May I make one parting point? The EPA, again, says that it considered who paid for the chemicals, presumably who paid for the chemicals in China before they're brought over here. There's no record of how they considered it, but our agency principle theory is essentially that if I gave $20 to my law clerk and said, go out and buy a couple of sandwiches for us, the law clerk doesn't own the sandwiches and then resell them to me when we get back to the conference room. That's the essence of the agency principle relationship. EPA, we're not sure how they considered, if they considered it, but that goes to the substantial basis for their decision. If they did not consider that fundamental principle of law, this Court must remand to the agency, but we don't think a remand is necessary. We think that the uncontroverted evidence that we gave to the agency in those four letters, which neither Company A nor Company B disclaimed, was the only basis that EPA had to make its decision, and that clearly qualifies Choice Refrigerants as the actual owner and the consignee, because there's no dispute that the chemicals and the... Well, if I could ask just one very quick question, Mr. Williamson. Just assume, and don't take the assumption as an answer as to how we'll resolve this, or I would, but if we assume that they're right about venue, from your perspective, does it make any difference whether we transfer venue to the D.C. Circuit or we dismiss the case since a prophylactic action's already been filed in the D.C. Circuit? Does that matter to you one bit? I hope it doesn't matter, Your Honor. I think the normal procedure would be to transfer... Yes, that's why I asked the question, but notably they ask for a dismissal because you'd already filed something in the D.C. Circuit, and I'm asking you whether that makes any difference to you and your ability to litigate your claim on the merits. I worry, of course, about being blindsided by some sort of jurisdictional or time limit, but we filed that protective petition, the same as we filed here, just a one-page petition, to avoid that, but I don't know if there's something that the government has in mind that I'm not seeing. So from your perspective, you'd prefer a transfer rather than a dismissal? If there has to be, yes. If there has to be, and that was just an assumption, just so I understood the small mechanical question. Thank you. Thank you, Your Honor. All right, thank you. Thank you, counsel, and the court will be in recess for, I guess, will be about 15 minutes.